IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
*Plaintiff/Appellee,*

v.

STEVEN GEORGE MORGAN,
*Defendant/Appellant.*

———————————

On Appeal from the United States District Court
for the Southern District of Florida

———————————

INITIAL BRIEF OF APPELLANT
STEVEN GEORGE MORGAN

———————————

MICHAEL CARUSO
Federal Public Defender
Attorney for Appellant
150 West Flagler Street, Suite 1500
Miami, Florida 33130
Telephone No. (305) 536-6900

THIS CASE IS ENTITLED TO PREFERENCE
(CRIMINAL CASE)

# CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

## United States of America v. Steven George Morgan
## Case No. 23-11114-AA

Appellant files this Certificate of Interested Persons and Corporate Disclosure Statement, listing the parties and entities interested in this appeal, as required by 11th Cir. R. 26.1.

Ajay, Alexander

Anton, Marc

Braun, David Joseph

Caruso, Michael

Cooley, Joseph

Dimitrouleas, Hon. William P.

Gonzalez, Juan Antonio

Haye, Nardia

Hunt, Hon. Patrick M.

Klco, Sara Michele

Lapointe, Markenzy

Latta, Brooke

Lewis, Jr., James Stewart

Maloney, Julie M.

Matzkin, Daniel

Michelen, Juan

Morgan, Steven George

Mulvihill, Thomas

Rubio, Lisa Tobin

Stowes, Ta'Ronce

Strauss, Hon. Jared M.

Zloch, William T.

*/s/ Michael Caruso*
Michael Caruso

## STATEMENT REGARDING ORAL ARGUMENT

Mr. Morgan respectfully submits that oral argument is necessary to the just resolution of this appeal because this case presents issues of great importance in this Circuit—whether, under the Fourth Amendment, the government may rely on unlawful police conduct or other coercive actions as evidence of abandonment justifying a warrantless cell phone search, and whether lay and expert witnesses may base their opinions on coerced statements and other unlawfully obtained evidence.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT .................................................................. C-1

STATEMENT REGARDING ORAL ARGUMENT ................................... ii

TABLE OF CITATIONS ......................................................................... vi

STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION ....................................................................................... 1

STATEMENT OF THE ISSUES ............................................................. 2

STATEMENT OF THE CASE ................................................................. 4

    Course of Proceedings and Disposition in the District Court ......... 4

    Statement of Facts ......................................................................... 7

    Standards of Review ....................................................................... 31

SUMMARY OF THE ARGUMENTS ..................................................... 32

ARGUMENTS AND CITATIONS OF AUTHORITY ............................. 35

I.    The district court erred by concluding the government proved Mr. Morgan voluntarily abandoned the LG cell phone, thereby permitting the admission of evidence obtained and derived from a warrantless search ............................................................. 35

A.    The government is required to obtain a warrant to search a cell phone .................................................... 36

B.    The government must prove the person voluntarily abandoned the property to justify a warrantless cell phone search ............................................................ 36

C.    A person's abandonment of property must be truly voluntary and not due to police misconduct or other coercive conduct ...................................................... 37

D.    To the extent Mr. Morgan abandoned the LG phone, he only did so because of unlawful police conduct and other coercive conduct ...................................................... 38

E.    The district court erred by holding that Mr. Morgan abandoned the LG cell phone ................................. 40

F.    The government forfeited reliance on the "independent discovery" rule, and the district court overstepped by relying on this additional rationale. ..................................... 42

G.    The "independent discovery" rationale fails on the merits ................................................................ 43

iii

H.    Because the district court made a constitutional error, the government must prove harmlessness beyond a reasonable doubt ................................................................ 44

I.    The government cannot meet the *Chapman* burden. .......... 44

II.    The district court erred by allowing Feo to testify about her un-mirandized custodial interrogation of Mr. Morgan and denying Mr. Morgan's request for a mistrial ................................ 48

III.    The district court committed plain error because Agent Gaviria based her lay opinion on the "entire investigation"—including unlawfully obtained evidence. Therefore, she did not rationally base her opinion on her perceptions, and her opinion was not helpful to the jury ................................................ 53

A.    Gaviria's Lay Opinion Based on the "Entire Investigation" Was Impermissible Because Not Based on Her Rational Perception ................................................ 55

B.    Gaviria's Conclusory Lay Opinion as to Mr. Morgan's Culpable Role in the Offenses Was Not Helpful to the Jury ................................................................................ 57

     C.    Gaviria's Lay Opinion Was Improperly Based on Inadmissible Evidence. ........................................................ 59

     D.    The District Court Committed Plain Error. ......................... 59

IV.  The district court committed plain error by not excluding expert testimony that relied upon Mr. Morgan's involuntary statements and violated rule 16. .................................................. 61

     A.    The district court erred by allowing Suarez to give his expert opinion based, in part, on unlawfully obtained evidence ................................................................................. 62

     B.    The government violated Rule 16 ........................................ 66

V.  The cumulative errors committed by the district court— failing to suppress the search of the LG phone, allowing the introduction of an un-mirandized statement, and improper lay and expert opinion testimony, and not correcting a rule 16 violation—require a new trial ........................................................ 68

CONCLUSION ........................................................................................ 69

CERTIFICATE OF COMPLIANCE ....................................................... 70

CERTIFICATE OF SERVICE ................................................................ 71

# TABLE OF CITATIONS

**Cases**

*Abel v. United States,*

    362 U.S. 217 (1960) ................................................................. 36

*Berkemer v. McCarty,*

    468 U.S. 420 (1984) ................................................................. 52

*Carrizosa v. Chiquita Brands Int'l, Inc.,*

    47 F.4th 1278 (11th Cir. 2022) .......................................... 65

*Chapman v. California,*

    386 U.S. 18 (1967) ........................................................... 44, 48

*\*Chavez v. Martinez,*

    538 U.S. 760 (2003) ................................................................. 42

*Daubert v. Merrell Dow Pharms., Inc.,*

    509 U.S. 579 (1993) ................................................................. 63

*Greenlaw v. United States,*

    554 U.S. 237 (2008) ................................................................. 42

*Howes v. Fields,*

    565 U.S. 499 (2012) ................................................................. 52

*Jarrell v. Balkcom,*

735 F.2d 1242 (11th Cir. 1984)............................................................66

*Maryland v. Shatzer,*

559 U.S. 98 (2010)..............................................................................52

*Michigan v. Harvey,*

494 U.S. 344 (1990)............................................................................65

*Mincey v. Arizona,*

437 U.S. 385 (1978)............................................................................65

*Miranda v. Arizona,*

384 U.S. 436 (1966)................................................................*passim*

*Murray v. United States,*

487 U.S. 533 (1988)............................................................................43

*New Jersey v. Portash,*

440 U.S. 450, (1979)..........................................................................65

*Riley v. California,*

573 U.S. 373 (2014)....................................................................36, 44

*Root v. Railway Co.,*

105 U. S. 189 (1882)..........................................................................48

*Ruiz v. Wing*,

    991 F.3d 1130 (11th Cir. 2021) .............................................................. 31

*Sornberger v. City of Knoxville, Ill.*,

    434 F.3d 1006 (7th Cir. 2006) ............................................................... 42

*U. S. ex rel. Romano v. Fay*,

    360 F.2d 389 (2d Cir. 1966) .................................................................. 65

*United States v. Ahmed*,

    73 F.4th 1363 (11th Cir. 2023) ...................................................... 31, 59

*United States v. Bailey*,

    691 F.2d 1009 (11th Cir.1982) .............................................................. 41

*United States v. Baker*,

    432 F.3d 1189 (11th Cir. 2005) ...................................................... 68, 69

\**United States v. Diaz*,

    951 F.3d 148 (3d Cir. 2020) ................................................... 57, 58, 59

*United States v. Doak*,

    47 F.4th 1340 (11th Cir. 2022) ............................................................. 32

*United States v. Dukagjini*,

    326 F.3d 45 (2d Cir.2003) .................................................................... 56

*United States v. Flores–de–Jesus,*

    569 F.3d 8 (1st Cir. 2009) .................................................... 59

*United States v. Floyd,*

    281 F.3d 1346 (11th Cir. 2002) ............................................ 63

*\*United States v. Garcia,*

    413 F.3d 201 (2d Cir. 2005) ...................................... 56, 57, 59

*United States v. Garcia–Morales,*

    382 F.3d 12 (1st Cir. 2004) ................................................. 59

*United States v. Garzon,*

    119 F.3d 1446 (10th Cir.1997) ............................................ 37

*United States v. Griffin,*

    324 F.3d 330 (5th Cir. 2003) .............................................. 59

*United States v. Grinage,*

    390 F.3d 746 (2d Cir. 2004) ...................................... 57, 60, 61

*\*United States v. Gwinn,*

    191 F.3d 874 (8th Cir. 1999) ..................................... 37, 39, 40

*United States v. Hampton,*

    718 F.3d 978 (D.C. Cir. 2013) ..................................... 60, 61

*United States v. Harris,*

    2023 WL 6313559 (11th Cir. Sept. 28, 2023) ......................................31

*United States v. Hodge,*

    933 F.3d 468 (5th Cir. 2019)..............................................................64

*\*United States v. Lewis,*

    921 F.2d 1294 (D.C. Cir. 1990) ....................................................37, 40

*United States v. Meises,*

    645 F.3d 5 (1st Cir. 2011) ....................................................................56

*United States v. Mitchell,*

    654 F. App'x 21 (2d Cir. 2016) .....................................................55, 56

*United States v. Ouedraogo,*

    824 F. App'x 714 (11th Cir. 2020).......................................................31

*United States v. Patane,*

    542 U.S. 630 (2004) ..............................................................................52

*\*United States v. Pirolli,*

    673 F.2d 1200 (11th Cir. 1982) ....................................................37, 41

*\*United States v. Ramos,*

    12 F.3d 1019 (11th Cir. 1994)................................................37, 38, 41

x

*United States v. Rea,*

958 F.2d 1206 (2d Cir.1992) ................................................. 55

*United States v. Scrima,*

819 F.2d 996 (11th Cir. 1987) .............................................. 64

*United States v. Sineneng-Smith,*

590 U.S. ---, 140 S. Ct. 1575 (2020) ..................................... 43

*United States v. Steed,*

548 F.3d 961 (11th Cir. 2008) ............................................. 36

*United States v. Turner,*

871 F.2d 1574 (11th Cir.1989) ....................................... 44, 48

*Watkins v. Sowders,*

449 U.S. 341 (1981) ........................................................... 65

**Statutes and Rules**

18 U.S.C. § 3231 ..................................................................... 1

18 U.S.C. § 3742 ..................................................................... 1

18 U.S.C. § 924(c)(1)(A) .......................................................... 4

21 U.S.C. § 841(a)(1) ............................................................... 4

21 U.S.C. § 963 ....................................................................... 4

28 U.S.C. § 1291 ...................................................................1

Fed R. Crim. P. 16 ..........................................................*passim*

Fed R. Evid.701 ..............................................................*passim*

Fed R. Evid. 703 ..............................................................63, 64

## Other Authorities

Wright, Charles A. and Gold, Victor J.,

  *Federal Practice and Procedure* § 6273 (1997) ......................................63

## STATEMENT OF SUBJECT MATTER
## AND APPELLATE JURISDICTION

The district court had jurisdiction of this case pursuant to 18 U.S.C. §3231 because the defendant was charged with an offense against the laws of the United States. The court of appeals has jurisdiction over this appeal pursuant to 28 U.S.C. §1291 and 18 U.S.C. §3742, which give the courts of appeals jurisdiction over all final decisions and sentences of the district courts of the United States. The appeal was timely filed on April 6, 2023 from the judgment and commitment entered on March 20, 2023, which disposes of all claims between the parties to this cause.

# STATEMENT OF THE ISSUES

I.    The district court erred by concluding the government proved that Mr. Morgan voluntarily abandoned the LG cell phone, thereby permitting the admission of evidence obtained and derived from a warrantless search.

II.   The district court erred by allowing Feo to testify about her un-mirandized custodial interrogation of Mr. Morgan and denying Mr. Morgan's request for a mistrial.

III.  The district court committed plain error because Agent Gaviria based her lay opinion on the "entire investigation"—including unlawfully obtained evidence. Therefore, she did not rationally base her opinion on her perceptions, and her opinion was not helpful to the jury.

IV.   The district court committed plain error by not excluding expert testimony that relied upon Mr. Morgan's involuntary statements and violated Rule 16.

V.    The cumulative errors committed by the district court—failing to suppress the search of the LG phone, allowing the introduction of an un-mirandized statement, and improper lay and expert

opinion testimony, and not correcting a Rule 16 violation—require a new trial.

## STATEMENT OF THE CASE

The appellant was the defendant below and will be referred to by his name. The appellee will be referred to as the government. The record will be noted under 11th Cir. R. 28-5.

Mr. Morgan is incarcerated.

### Course of Proceedings and
### Disposition in the District Court

A grand jury indicted Mr. Morgan with conspiracy to import cocaine, 21 U.S.C. § 963, attempted possession with intent to distribute cocaine, 21 U.S.C. § 841(a)(1), and possession of a firearm in furtherance of a drug trafficking crime, 18 U.S.C. § 924(c)(1)(A). (DE9,35).

Before trial, Mr. Morgan filed a Motion to Suppress Statements and Physical Evidence, to which the government filed a response. (DE52,55). This motion concerned two statements the government alleged Mr. Morgan made on the day of a controlled delivery (11/12/2020), a statement he made eighteen months later on the day of his arrest (6/7/2022), and evidence obtained by a post-arrest warrantless search of an LG cell phone seized the day of the controlled delivery. (DE52,55).

After an evidentiary hearing, the district court granted in part and denied in part the motion as follows:

I'm going to grant the motion to suppress the statements that he made on November 12th [2020]. I'm going to grant the motion to suppress the statements he made on June 7th [2022], finding that they were involuntary. I'm going to find that the agents were reasonable in deciding that he had abandoned the LG phone and deny the motion to suppress the contents of the LG phone.

(DE115:62-63). Because Mr. Morgan made two separate statements on the day of the controlled delivery (11/12/2020), the prosecutor asked for a clarification—whether the government could introduce Mr. Morgan's "initial statement" that the LG phone belonged to him. (DE115:63). The court agreed and told the prosecutor he could introduce that statement. (DE115:63).

During the trial, however, the district court revisited the issue of Mr. Morgan's initial statement:

> . . . *but I changed my mind in the middle of the trial* when I heard, you know, the facts of the case and from the witness testifying I think it was an interrogation and I think it was without *Miranda*, and I changed my ruling. But there's no way that the witness would have known that I changed my ruling, and there's no way for you to have communicated to the witness that I changed my ruling; so she was just offering what she thought, you know, she was supposed to testify to. It was unresponsive, and I'll tell the jury to ignore it, that its not for their consideration.

(DE121:74-75) (emphasis added).

In a written order entered *after* the jury's verdict, the district court held: "9. The statements on November 12, 2020 are suppressed as a violation of *Miranda.* 10. The statements during the two hour interview on June 7, 2022 are suppressed as both a *Miranda* violation and as involuntary." (DE63). The district court again denied the motion to suppress the search of the LG phone, finding that Mr. Morgan abandoned the property and, in the alternative, that the government would have independently discovered the cell phone's contents. (DE63). The government never asserted, however, that the independent discovery doctrine justified the search of the LG phone, relying exclusively on an abandonment theory. (DE55).

The jury found Mr. Morgan guilty of all charges. (DE64). The district court sentenced Mr. Morgan to 72 months' imprisonment on the drug charges, to run concurrently, and to 60 months' imprisonment on the gun charge, to run consecutively. (DE93). Mr. Morgan appealed his conviction and sentence. (DE94).

## Statement of Facts

### 1. Law Enforcement Seized a Package Containing Cocaine in October 2020.

On October 26, 2020, a now-retired Customs and Border Protection (CBP) canine officer—Ditzel—was working at the Luis Munoz Marin Airport in Puerto Rico and "alerted" to a package shipped from Stanford St. John in St. Maarten to David Stephenson in Lauderhill, Florida. (DE117:27-32;GX1-2).

Once Ditzel alerted, her handler—CBP Officer Joel Rivera—called his colleagues from the enforcement team to investigate. (DE117:30). The enforcement team opened the package and discovered "bump stopper cream" bottles. (DE117:31,33;GX2). While searching the package, Rivera saw the bottles contained a white powder he suspected was cocaine. (DE117:33-34). A later forensic analysis confirmed Rivera's suspicion—the white power was cocaine. (DE117:53).

Law enforcement could not locate a David Stephenson associated with the Lauderhill address, and the agents destroyed the package and did not attempt a controlled delivery. (DE121:79-81,144).

**2.     Law Enforcement Seized a Package Containing Cocaine in November 2020.**

A week later, on November 2, 2020, while working at the San Juan Airport in Puerto Rico, CBP canine officer Phillip alerted to two packages shipped from Juwonn Butch in St. Maarten to Damion Roberts in Lauderhill, Florida. (DE117:69-72;DE121:82-83;GX4,6). These packages also contained bump stopper cream bottles. (DE117:73,76;GX5). The bottles were outfitted with a false bottom containing a white powder that "field tested" positive for cocaine. (DE117:79,83). A forensic analyst later determined the powder in the bottles was approximately 1.8 kilograms of cocaine. (DE117:97,101).

Law enforcement could not locate a Damion Roberts associated with the address in Lauderhill. (DE121:83). Rather, Andre Harris owned the apartment. (DE121:85).

**3.     The Agents Decided to Conduct a Controlled Delivery.**

Eventually, a co-worker informed CBP Officer Christopher Torres that they had intercepted the November packages. (DE117:109). At this time, law enforcement decided to conduct a controlled delivery. (DE 117:109-110). Torres wired the packages with tracking devices and break wire beacons to monitor their movement and learn if they were opened.

(DE117:109-110). Before the delivery, agents obtained an "anticipatory" search warrant. (DE117:117).

## A.    The Agents Conducted Surveillance of the Address.

The packages were delivered to the Lauderhill address by leaving them at the apartment's front door. DE117:116, 120-121). An hour later, Torres, conducting surveillance, saw a car arrive at the apartment complex. (DE117:121). Homeland Security Investigations (HSI) Agent Mariana Gaviria also helped surveil the apartment for the controlled delivery. (DE121:85,145).

A person, later identified as Diego Elizondo Arias, got out of the car, went to the apartment's door, and took a cellphone photo of the packages. (DE117:121-122;DE121:85,90-91). Elizondo, who had keys to the apartment, picked up the packages and brought them inside. (DE117:123,200;DE121:85). He also sent a message to "Bucha," who Elizondo later said was Mr. Morgan. (DE121:90-91).

After being in the apartment for a few minutes, Elizondo went outside to the balcony and smoked. (DE117:201). He went back inside the apartment, used the bathroom, went to the kitchen, and then to his bedroom. (DE117:201).

Another man in the car went into the apartment about ten to fifteen minutes after Elizondo—agents later identified this man as Mr. Morgan. (DE117:123-125,180,201;DE121:86-87). Mr. Morgan did not have keys to the apartment. (DE117:168). A third man remained in the car but left shortly after. (DE117:166,173,198-199;DE121:87).

According to Elizondo, when Mr. Morgan entered the apartment, he did not touch the packages. (DE117:201). Once inside, Mr. Morgan asked Elizondo whether he could use the bathroom. (DE117:201). When Mr. Morgan was in the bathroom, Elizondo claimed he was in the kitchen, and one of the packages was not there. (DE117:202). He did not see Mr. Morgan take the package. (DE117:202). Elizondo went back to his bedroom. (DE117:203).

**B.     The Package Alerted.**

Fifteen minutes after Mr. Morgan went inside the apartment, the break wire "went off." (DE117:125,DE121:88). The agents never conducted any forensic testing—fingerprints or DNA—to determine who had opened the package. (DE121:149).

### 4.     The Agents Stormed the Apartment.

After the package alerted, Torres signaled the law enforcement team. (DE117:126). About eight to ten officers "formed up" and approached the apartment. (DE117:126). Torres—"the breacher"—was the first to the door. (DE117:127). The officers wore tactical gear and had their guns drawn—like a SWAT team or military operation. (DE117:173). Torres knocked on the door twice and, in a loud voice, announced the police were there with a warrant. (DE117:127). When no one answered, Torres told the team he would be breaching the door and broke down the door using a battering ram. (DE117:130).

### 5.     The Agents Detained Mr. Morgan and Elizondo.

#### A.     The Agents Detained Mr. Morgan.

After he broke the door down, Torres saw Mr. Morgan toward the rear of the apartment in the living room area. (DE117:133). When he saw the officers, Mr. Morgan stopped, and the agents took him into custody and handcuffed him. (DE117:134,141-181-182). Mr. Morgan did not resist and cooperated with the officers. (DE117:185).

When he broke into the apartment, Torres saw one of the boxes in the general area at the front door. (DE117:134;GX 19). The officers also

11

saw packaging material in a bedroom's bathroom and the bump stopper cream bottles outside the bedroom. (DE117:135-136;GX 20-21).

HSI Agent Christiana Feo assisted with the controlled delivery— she helped surveil the scene. (DE121:63,65). When Feo entered the apartment, her partners had taken Mr. Morgan and Elizondo into custody. (DE121:65). Specifically, two of Feo's partners had Mr. Morgan "on the ground, prone, in custody." (DE121:65).

## B.     The Agents Searched Mr. Morgan.

Feo claimed she saw her partners search Mr. Morgan. (DE121:66). In particular, Feo said she saw her partners "collect a blue LG cell phone." (DE121:67). While she could not recall where her partners found the LG phone, she said that "generally speaking," they found the phone "[o]n [Mr. Morgan's] person." (DE121:66-67;GX 33). The iPhone had an incoming call from St. Maarten. (DE117:140;DE121:13-14).

Mr. Morgan also had a firearm in a bag he wore across his chest. (DE117:145,180-181). Rather than uncuff him to remove the bag, Torres cut the bag off Mr. Morgan's body. (DE117:145).

### C. Agent Feo Interrogated Mr. Morgan Without Providing Any *Miranda* Warnings.

Although Feo saw her partners had placed Mr. Morgan in custody, she questioned him without providing *Miranda* warnings. (DE121:68). Without the benefit of any warning, she asked Mr. Morgan whether both phones were his. (DE115:10,32). He responded yes. (DE115:10,32).

At trial, when the prosecutor attempted to elicit Mr. Morgan's un-*Mirandized* statement, the defense objected. (DE121:68). The district court reminded the prosecutor—at sidebar—that he had suppressed these statements. (DE121:69). The prosecutor did not challenge the district court's ruling.

The matter did not end there. On cross-examination, defense counsel asked Feo whether she knew where "on his person" the agents took the LG phone from Mr. Morgan. (DE121:71). By this question, defense counsel clearly asked Feo whether she knew the location on Mr. Morgan's body from where the agents seized the phone. (DE121:71). Feo answered: "I don't know exactly where it came from on his person, but it came off of him because I confirmed that by speaking with him." (DE121:71). The first part of her answer responded to counsel's question

while the second part was non-responsive and violated Mr. Morgan's rights.

When counsel challenged her recollection—and asked whether the agents actually found the LG phone on the floor, Feo agreed. (DE121:71). Indeed, Torres testified he only saw the phones on the floor. (DE117:170-71). Determined to tell the jury about Mr. Morgan's un-*Mirandized* statement, Feo began to say, "I was in charge of asking specific to this --" but counsel cut her off to protect Mr. Morgan's rights. (DE121:71).

When defense counsel pressed this issue, the trial prosecutor interrupted with a misrepresentation that coached Feo in her answer: "Your Honor, the witness has repeatedly testified that she took it off -- that *she saw it on his person*." (DE121:72) (emphasis added). Contrary to the prosecutor's coaching, Feo actually had testified "repeatedly" that *she did not see* from where her partners had seized the phone. (DE121:66-67,71). Instead, her purported source for that information was Mr. Morgan's un-*Mirandized* statement to her. (DE121:71). This became crystal clear when Feo finally answered:

Q. You didn't see it come out of his pocket; right?

A. I don't recall where the phone was.

14

Q. You didn't see if he had it on his waist in some kind of a thing? A clip? You didn't see that; right?

A. I can't recall exactly where it was found.

Q. You don't recall whether he had it in his hand; right?

A. I cannot recall.

(DE121:72).

Later, in response to a leading question by the prosecutor, Feo also said her partners had found a loaded firearm in Mr. Morgan's waistband. (DE121:70). This testimony contradicted other testimony that the officers found the gun in a bag Mr. Morgan wore across his chest. (DE117:145,180-181).

After the district court excused Feo, defense counsel raised the *Miranda* issue and requested a mistrial. (DE121:73-74). The district court said in response to counsel's argument: THE COURT: "There's no way what the reason was -- because we're at sidebar, there's no way she can hear what was ruled on so she answered the question by volunteering information that wasn't responsive to the question." (DE121:74). Although the district court agreed that Feo gave an unresponsive answer that violated Mr. Morgan's constitutional rights, he denied the motion for mistrial. (DE121:73-74).

The issue then took another turn. The prosecutor asked the district court "to revisit . . . your ruling on the pretrial motion . . . – [and asserted that] in fact, I remember we specifically asked if we could elicit that particular statement that he claimed ownership and your ruling at that time was that we could but [defense counsel] could in turn elicit the statement that he later learned." (DE121:74). The district court responded:

> It was definitely what I ruled, *but I changed my mind in the middle of the trial* when I heard, you know, the facts of the case and from the witness testifying I think it was an interrogation and I think it was without *Miranda*, and I changed my ruling. But there's no way that the witness would have known that I changed my ruling, and there's no way for you to have communicated to the witness that I changed my ruling; so she was just offering what she thought, you know, she was supposed to testify to. It was unresponsive, and I'll tell the jury to ignore it, that its not for their consideration.

(DE121:74) (emphasis added).

Based on this statement, the district court believed he ruled before trial that the prosecutor could elicit the un-*Mirandized* statement only to change his mind during the trial and neglect to inform the parties. (DE121:74). When the trial prosecutor attempted to elicit Mr. Morgan's answers, the defense objected. (DE121:68). At sidebar, the district court told the prosecutor he had suppressed these statements. (DE121:69). The

prosecutor did not challenge this ruling. Therefore, he did inform the parties—at that point—he had decided to suppress those statements. To try to remedy the issue, the district court gave the jury an instruction after Feo had been excused. (DE121:75).

**D.    The Agents Also Detained Elizondo and Questioned Him.**

On the day of the controlled delivery, while the other officers were with Mr. Morgan, Torres went to a bedroom. (DE117:142-142). After he knocked quickly, he breached the locked door. (DE117:142). Torres saw Elizondo on the floor "playing with his phone." (DE117:142;GX23). He told Elizondo to put his hands up, roll over, and prepare to be handcuffed. (DE117:142). Elizondo complied. (DE117:142). Elizondo said he did not hear any knocking but did hear a "big noise, boom" at the front door. (DE17:203-204). He did try to get up when he heard the knock at his bedroom door but could not because of a knee problem. (DE117:204).

According to Elizondo, he and Mr. Morgan had been neighbors and friends. (DE117:191-192). Elizondo is an undocumented person. (DE117:189,191-192). After the controlled delivery, officers took Elizondo into immigration custody. (DE117:189). He remained in custody until he was released after a change in government policy. (DE117:190). He is

seeking asylum from being removed to Costa Rica despite being an "overstay" on his visa for about six and one-half years. (DE117:209,211). Despite his overstay, he denied receiving any promises from the prosecutors in exchange for his testimony. (DE117:190).

Elizondo claimed that at an earlier time, Mr. Morgan asked him to wire $2,500 to Jamaica because he did not have identification. (DE117:193-194). Mr. Morgan spoke with the Western Union employee who handled the wire. (DE117:195). He gave Elizondo a $50 gift card for his help. (DE117:195).

Elizondo had been living at the apartment where the controlled delivery occurred in exchange for doing remodeling work. (DE117:195-196). Elizondo said after he started living in the apartment, Mr. Morgan asked whether he could "store some things" with him because he and his wife were fighting. (DE117:196).

On the day of the delivery, Mr. Morgan asked Elizondo whether the packages arrived. (DE117:198) ("Then I received this phone call from [Mr. Morgan]. He wanted to know whether the packets had arrived."). Mr. Morgan said he would pick Elizondo up and take him to his apartment. (DE117:198). Eventually, another friend—the driver—and

Mr. Morgan picked Elizondo up and drove him to the apartment. (DE117:198-199).

When they were in the apartment together, Elizondo never saw Mr. Morgan open the packages. (DE117:221).

### 6. After He was Handcuffed and Placed in an HSI car, Agents Read Mr. Morgan his *Miranda* Rights, and He Invoked His Rights to Silence and Counsel.

After agents took Mr. Morgan from the apartment to an HSI car in handcuffs, Gaviria finally read him his *Miranda* rights. (DE115:10-11, 14). She also gave Mr. Morgan a written advice of rights form to allow him to follow the oral warnings. (DE115:11/Suppression Hrg. GX4). Mr. Morgan told Gaviria he understood and signed the written form indicating the same. (DE115:11-13). Mr. Morgan unequivocally invoked his rights to remain silent and to counsel. (DE115:13,32).

Despite Mr. Morgan's express invocation of his constitutional rights, Gaviria later returned to the car and questioned him. (DE115:14,33). Specifically, Gaviria asked Mr. Morgan if the two phones agents seized from him belonged to him. (DE115:14). Mr. Morgan became flustered and said, "Uhm [sic] I don't know, I'm not sure." (DE115:14). Not satisfied with that answer, Gaviria misrepresented "that [she] wasn't

trying to interrogate him or ask him questions about the case." (DE115:14). According to Gaviria, she told Mr. Morgan that she "just need[ed] to know if they belonged to him so that [she] could make a note of who the property belonged to in case [she] needed to return it." (DE115:14).

In response to this unlawful questioning, Mr. Morgan answered, "Only the iPhone." (DE115:14). Notwithstanding her earlier "promise" that this wasn't an interrogation, Gaviria pressed him, "Are you sure? Because I had been told that they had both come from [you]." (DE115:14). Mr. Morgan finally said that only the iPhone belonged to him. (DE115:14).

## 7. The Agents Later Employed a Ruse to Extract Involuntary Statements from Mr. Morgan.

About eighteen months after the controlled delivery, prosecutors obtained a criminal complaint against Mr. Morgan. (DE115:17). Using a self-described "ruse," Gaviria called Mr. Morgan and lied that she wanted to arrange a meeting to "return some property to him." (DE115:19,34). This ruse was similar to the one Gaviria used to question Mr. Morgan after he had invoked his *Miranda* rights. *See supra* at pp. 19-20.

Mr. Morgan fell for this second ruse and subsequently went to an HSI office to meet with Gaviria. (DE115:20). During the initial interaction with Mr. Morgan, Gaviria said, "All right. So we're just hoping to get to talk to you a little bit today before everything. Do you have time?" (DE115:22). Mr. Morgan responded, "Not really." (DE115:22). Gaviria then asked, "Why not?" (DE115:22). After Mr. Morgan responded, Gaviria pressed, "Gotcha. Um, you remember like the circumstances that we met under last time." (DE115:23) (presumably referring to his invocation of his rights to remain silent and to counsel on the day of the controlled delivery).

Undeterred, Gaviria continued, "Um, and you remember you didn't really wanna talk to me then. So, since you're here, I was just hoping that maybe you'd be willing to talk to me now, since some time has passed." (DE115:23). Mr. Morgan responded, "No, ma'am. I, that wouldn't be good for me. I wouldn't do that." (DE115:23). Despite this unambiguous response, Gaviria continued to engage Mr. Morgan: "Okay. What do, what do you mean by that?" (DE115:23). Gaviria pressed more: "Um, the main thing is, I have, like you said, we've investigated a lot since last time. I still have some questions from the last time, and I remember that

the last time I spoke to you, you were like, 'You know I kind of would have liked to talk to you, but I don't wanna shoot myself in the foot,' right? That's sort of what you told me?" (DE115:24). Mr. Morgan responded, "Mm-hmm." (DE115:24). Mr. Morgan also said," I have rights, you know what I mean." (DE115:40).

Despite Gaviria knowing that Mr. Morgan had rights, she was undeterred and told Mr. Morgan: "It's been over a year now, right? And not talking to us didn't solve the problem. So maybe talking to us will help you. And help me. And at the end of the day, you only have to talk as much as you want to talk, or not talk as much as you don't wanna talk. Right? It'll be up to you." (DE55-1:3).

Another agent joined the coercive questioning: "Yeah look, you can have a lawyer. That's totally within your right, you're being talked to by the police. You know, you're here, we're saying you're detained. Okay? But what we wanna do is talk to you and explain like what's going on. And as you tell us stuff, we can tell you stuff. Okay?" (DE55-1:3). The other agent continued: "Because what happens is if you talk to a lawyer, they're gonna be like, don't say anything. Which is fine, that's within their right, that's the lawyer's advice, that's his job. Okay?" (DE55-1:3).

After Mr. Morgan said, "Mm-hmm," this agent drove the point home: "But the lawyer doesn't do the time in jail, you do the time in jail."

Eventually, after the agents believed they'd broken Mr. Morgan, they "explained" his "rights."

> Here what I'm gonna do. I'm gonna give you the- the, your rights form, okay? So, we advise you of your rights. Alright? You know your rights anyway. Alright? You read this; you understand your rights. *We'll explain a couple things to you and then you can either answer or not answer, right? And you can say, wow, you guys got me. Or you can say, wow, you guys got me but I wanna help myself. Or you can say, you guys got me, you guys can go fuck yourself, I want a lawyer.* Whatever you wanna do. This way, we can have a discussion. This way we're not tricking you, we're telling you your rights. We're within our legal authority to do this and we can talk freely and you can say, I don't wanna answer that, ask me something else. (emphasis added).

> Or you can say . . . I wanna know about this. Exactly. This is not in any way take away your right not to talk to us or anything. This is explaining just your rights that you have right now. You know your rights; you already have them. *You want a lawyer here, call your lawyer. We'll wait all day for your lawyer to come here. But what he's gonna say, he's gonna be like, don't talk to the police. Let's see what they do. And then he's gonna go home and you're going to [] main jail. That's the real.*

> *You don't even have to sign the form, you can just say you understand the form, that you read it, you understand it, and you can say, okay, let's talk. Or let's start and let's see what happens.*

Mr. Morgan said: "This-this is, this is psyching me out. I'm reading my rights, and my rights is telling me not. 'Cause this is psyching me out. I'm reading my rights, and my rights is telling me not to say nothing."

After the agents had Mr. Morgan read his rights aloud, he said: "Feel like I'm in the Twilight Zone, you know?"

Sensing defeat, the agent said: "What we're saying is... we have enough evidence right now. You don't have to say a word. [] You're, you're done. You're done. We, we, we'll convict you like that. And that's no bullshit. []. If you wanna help yourself, this is your opportunity. []. So now we're giving you the opportunity. If she had come to you and you were like, "Hey, leave me the fuck alone, I don't ever wanna talk to you. I never talk to the police. I don't care, come get me," we would not be having this conversation like this." [].

So right now is the opportunity to help yourself and continue to show, like, "I'm not a bad guy." Nobody's gonna judge you. If you say, "Oh, vi-"

[]

After breaking him down, the agent said: Why don't we have a discussion? You're here."

(DE 55-1:10-14)(emphasis added).

Due to the coercive tactics, Mr. Morgan relented and said, "Alright." Ultimately, Mr. Morgan talked with the agents without a lawyer present for about two hours. (DE115:20-27;DE55-1:13-57). After the interrogation, agents arrested Mr. Morgan based on a previously obtained warrant. (DE115:27).

**8. Law enforcement performed a data extraction from the LG cellphone.**

At trial, Gaviria told the jury about the data extraction from the LG phone. (DE121:97). Gaviria began by detailing the evidence found on the cell phone that connected the phone to Mr. Morgan—photos, messages, and email accounts. (DE121:97). The prosecutor then introduced a summary report Gaviria generated from the extraction. (DE121:98; GX 35). Gaviria testified claimed the search of the LG cellphone revealed incriminating evidence against Mr. Morgan to include email addresses associated with him, communications with individuals from St. Maarten, and WhatsApp conversations discussing the coordination of shipments. (DE121:97-113;GX35).

Specifically, Gaviria testified the extraction showed several messages between Mr. Morgan and another person—"Bredda"—in St. Maarten. (DE121:98,101-103;GX35). Gaviria testified messages between Mr. Morgan and Bredda were linked to various shipments. (DE121:103-104;GX 36,38,42).

In addition, the government introduced DHL waybills and invoices an analyst extracted from the LG phone. (DE121:104-112;GX37-38,42).

Gaviria linked these waybills and invoices to messages between Mr. Morgan and Bredda. (DE121:105).

Gaviria also testified, through the extraction, she found messages discussing Western Union transactions and photos of Western Union receipts. (DE121:113,128-129;GX 40). She further testified, based on the search of the LG phone, Mr. Morgan had "multiple text conversations where he asked people either directly to send money on his behalf or find other people who would be willing to send money on his behalf." (DE121:121-128;GX47-48).

## 9. The Cell Phone Extraction Provided Information that Led Gaviria to Subpoena DHL and FedEx.

Gaviria testified that the information she found on the LG phone led her to subpoena the shipping company DHL for waybills and invoices. (DE121:106-112;GX36-38). Comparing the DHL records to the information on the LG phone, Gaviria testified Mr. Morgan gave Bredda a phone number, name, and address for a shipment. (DE121:112). Bredda then shipped the package and gave Mr. Morgan the confirmation. (DE121:112).

Gaviria also issued a subpoena to FedEx based on information from the LG phone. (DE121:137-142;GX45-46). These subpoenas showed

shipments of bump stopper cream from the United States to St. Maarten. (DE121:141).

## 10. The Cell Phone Extraction Provided Information that Led Gaviria to Subpoena Western Union.

Gaviria testified the information she found on the LG phone led her to subpoena Western Union for information regarding payments connected to the shipments. (DE121:112-117,121;GX 39). Gaviria also testified that by comparing the Western Union records to the information they found on the LG phone, she concluded Mr. Morgan—through text messages—sent money to various people in St. Maarten. (DE121: 121-129;GX40,47-48).

## 11. Gaviria Prepared Two Charts—Using Information Found on the LG Phone— Linking the DHL and Western Union Records to Various Shipments.

Using the information they found on the LG phone, Gaviria prepared a chart comparing the money Mr. Morgan sent to St. Maarten versus the value of the bump stopper cream bottles shipped to the United States. (DE121:130;GX41).

Gaviria also prepared a chart summarizing the information that linked Mr. Morgan to thirteen shipments using the information they found on the LG phone and other records. (DE121:130-136;GX43). On

this chart, there were nine separate references that identified information sourced from the LG phone. (GX43).

## 12. The Prosecutor Elicited Lay Opinion Testimony from Gaviria Based on the "Entire Investigation."

Gaviria—who questioned Mr. Morgan without providing *Miranda* warnings and elicited involuntary statements from him—has been an agent with HSI for three years. (DE121:76). As an HSI agent, she has received extensive and regular training. (DE121:76-77). Notwithstanding her training, Gaviria violated Mr. Morgan's rights and offered improper lay opinion testimony based in part on unlawfully obtained evidence at the trial:

> Q. And so based on your investigation of this case, can you give us an overview of the international drug trafficking scheme involving the BUMP Stopper cream that you recovered in this case?
>
> A. Yes. So over the course of the entire investigation, I obtained information indicating that the defendant had purchased BUMP Stopper cream from a legitimate seller here in the United States, arranged for these products to be shipped to Saint Martin [sic] where a contact known to me as Bredda received the shipments, placed cocaine concealed into a false bottom in these containers and shipped the containers back to addresses provided by the defendant. I also obtained information that the defendant either directly or by asking other people caused money to be sent back to Saint Martin to individuals whose information was provided by Bredda.

(DE121:78).

### 13. The Government Elicited Expert Testimony—Based in Part on Mr. Morgan's Involuntary Statements—at Trial.

Marco Suarez is an HSI Agent and offered expert testimony at the trial. (DE121:6). According to Suarez, he relied on three reports that Gaviria provided him to form his expert opinion: (1) a report that detailed the November 2020 seizure; (2) a report that detailed an "interview" involving Mr. Morgan; and (3) a summary of the LG phone that belonged to Mr. Morgan. (DE121:17). Suarez also reviewed an Excel spreadsheet prepared by Gaviria "listing approximately 58 or 59 Western Union transactions." (DE121:17).

Mr. Morgan objected to the government eliciting from Suarez that agents interviewed Mr. Morgan—an "interview" the district court had ruled was the product of coercion by the agents and that had produced involuntary statements. (DE121:17). Mr. Morgan also moved for a mistrial. (DE121:17). The district court denied the motion for mistrial but offered to provide a curative instruction to the jury. (DE121:18). The defense declined the district court's offer, fearing the curative instruction would only exacerbate the problem. (DE121:18).

The prosecutors called Suarez to provide expert testimony against Mr. Morgan about "narcotics, narcotics pricing, international narcotics distribution and the use of firearms therein." (DE121:20). The defense objected, and the district court ruled: "I think he's an expert on some things, and if [Mr. Morgan's lawyer] objects, I'll rule on the objections." (DE121:20). The judge did not explain what he meant by this ruling.

Suarez ultimately testified that the Western Union transactions linked to Mr. Morgan were "highly suspicious" and that he was attempting to conceal these transactions from law enforcement. (DE121:33-34). The prosecutor also showed Suarez a photograph of a seized bump stopper cream bottle with a false bottom that Suarez testified was consistent with drug trafficking. (DE120:39-40;GX 7).

**14. Closing Arguments.**

In the closing argument, the prosecutors made numerous references to the evidence found on the LG phone. (DE124:19,20-21,25-26,46,48). They also argued the FedEx, DHL, and Western Union records found on the LG phone and derived from the warrantless search proved Mr. Morgan's guilt. (DE124:16-19,21,24,28,47,49GX41). Finally, the

prosecutors referred to Suarez and Gaviria's testimony in pressing Mr. Morgan's guilt. (DE124:16,20,27).

## Standards of Review

This Court reviews "the denial of a motion to suppress under a mixed standard of review, examining the district court's factual determinations for clear error and reviewing the district court's application of law to those facts *de novo*." *United States v. Harris*, No. 22-10887, 2023 WL 6313559, at *1 (11th Cir. Sept. 28, 2023).

A court may consider errors harmless only where the government can show beyond a reasonable doubt the error did not influence the verdict in the case. *United States v. Ouedraogo*, 824 F. App'x 714, 721 (11th Cir. 2020).

Courts generally review a district court's evidentiary ruling for abuse of discretion. *United States v. Ahmed*, 73 F.4th 1363, 1380 (11th Cir. 2023). If "a party failed to object to an evidentiary ruling at trial," however, the review is for plain error. *Id.*

A district court's disposition of a motion for a mistrial is reviewed for abuse of discretion. *Ruiz v. Wing*, 991 F.3d 1130, 1137 (11th Cir. 2021).

This Court will "review the cumulative impact of trial errors *de novo*, and reverse … if, in total, the non-reversible errors result in a denial of the constitutional right to a fair trial." *United States v. Doak*, 47 F.4th 1340, 1360 (11th Cir. 2022).

## SUMMARY OF THE ARGUMENTS

Government agents violated Mr. Morgan's constitutional rights at every turn. First, on the day of the controlled delivery, the agents interrogated Mr. Morgan while he was in custody without providing *Miranda* warnings. Second, they interrogated him again—after they handcuffed and held him in the back of a police car—following his invocation of his *Miranda* rights to silence and counsel. Third, eighteen months later, during a custodial interrogation, they coerced an involuntary statement from him, after which they arrested him. Finally, at Mr. Morgan's trial, the agents gratuitously testified about suppressed evidence to the jury.

Following Mr. Morgan's arrest, the agents conducted a warrantless search of an LG cell phone seized from Mr. Morgan on the day of the controlled delivery. While the district court suppressed the statement Mr. Morgan made after he invoked his *Miranda* rights, the district court

allowed the government to use this statement to show he had abandoned the LG phone, justifying the warrantless search. (DE115:62-63). The incriminatory evidence the government obtained from this search pervaded the trial—the government introduced electronic evidence found on the phone, and the case agent who offered lay opinion testimony and an expert witness based their testimony on this evidence.

In permitting the government to introduce this evidence, the district court made multiple errors. *First*, the court erred by finding the evidence as to whether Mr. Morgan abandoned the phone "uncontradicted." When initially asked on the day of the controlled delivery, Mr. Morgan told the agents both phones taken from him were his—this statement directly contradicts his later statement made after the agent pressured him post-invocation. (DE115:10,32).

*Second*, the court erred by concluding the agents were "reasonable" in believing Mr. Morgan had abandoned the LG phone. But the court misunderstood the burden of proof—the government had to prove that Mr. Morgan *voluntarily* abandoned the property, not whether the agents reasonably believed he did. Moreover, the agents were not reasonable, given they had seized the phone from Mr. Morgan's person; he initially

admitted the phone belonged to him, and his disavowal only resulted from persistent questioning after he had invoked his *Miranda* rights to silence and counsel. (DE115:10, 13-14,32; DE121:60-67). *Third*, and most critically, the court erred by implicitly holding Mr. Morgan's abandonment was voluntary and not the product of police misconduct. Because the court erred, and the government cannot prove harmlessness beyond a reasonable doubt, this Court should vacate Mr. Morgan's convictions.

The district court made other errors that warrant reversal. First, the court allowed Agent Feo to testify about the initial un-*Mirandized* statement regarding the LG phone—despite giving a curative instruction, the court erred by not suppressing this statement before trial, and then when he changed his mind during trial, he neglected to inform the parties. Second, the court plainly erred by permitting Agent Gaviria to offer her lay opinion that Mr. Morgan engaged in international drug trafficking. This testimony violated Federal Rule of Evidence 701 because Gaviria's conclusory opinion was unhelpful to the jury and improperly based on the "entire investigation." Third, the court erred by allowing the government's expert witness, Agent Suarez, to testify based,

in part, on a report of Mr. Morgan's involuntary statement, which is inherently unreliable. These errors, alone or in combination, should result in reversal.

## ARGUMENTS AND CITATIONS OF AUTHORITY

### ISSUE I

**THE DISTRICT COURT ERRED BY CONCLUDING THE GOVERNMENT PROVED THAT MR. MORGAN VOLUNTARILY ABANDONED THE LG CELL PHONE, THEREBY PERMITTING THE ADMISSION OF EVIDENCE OBTAINED AND DERIVED FROM A WARRANTLESS SEARCH.**

The agents here hit for the cycle. First, on the day of the controlled delivery, they interrogated Mr. Morgan while he was in custody without providing *Miranda* warnings. Second, that same day, they interrogated him again—after they handcuffed and detained him in the back of a police car—following his invocation of his *Miranda* rights to silence and counsel. Third, eighteen months later, they coerced an involuntary statement from him during a custodial interview. Finally, at Mr. Morgan's trial, the agents gratuitously testified about suppressed evidence to the jury.

Astonishingly, the government sought to introduce all the evidence they obtained by violating *Miranda* and coercing an involuntary

statement. (DE55;DE115:61,63). While the court suppressed Mr. Morgan's statement in the police car after he invoked his *Miranda* rights, the court allowed the government to use this statement to show that he had allegedly abandoned the LG phone, justifying a warrantless search. (DE115:62-63). By allowing the government to use this evidence at trial, the district court committed a grave constitutional error, and this Court should vacate Mr. Morgan's convictions.

## A. The government is required to obtain a warrant to search a cell phone.

Generally, the police must have a warrant to search a cell phone. *See Riley v. California*, 573 U.S. 373, 386 (2014) (holding the police may not search a seized cell phone without a warrant). Therefore, a warrantless cell phone search is "per se unreasonable under the Fourth Amendment." *United States v. Steed*, 548 F.3d 961, 967 (11th Cir. 2008) (recognizing the general rule is warrantless searches are *per se* unreasonable under the Fourth Amendment).

## B. The government must prove the person voluntarily abandoned the property to justify a warrantless cell phone search.

Notwithstanding, the Fourth Amendment does allow for a warrantless search of abandoned property. *Abel v. United States,* 362

U.S. 217, 241 (1960). The test for abandonment is whether the defendant voluntarily relinquished his interest in the property and no longer retained a reasonable expectation of privacy. *See United States v. Ramos*, 12 F.3d 1019, 1023 (11th Cir. 1994). The government bears the burden of proving a person has abandoned the property and his corresponding expectation of privacy. *Id.*

**C.     A person's abandonment of property must be truly voluntary and not due to police misconduct or other coercive conduct.**

For evidence to be admissible under this theory, the person's abandonment must be truly voluntary and not merely the product of police misconduct or other coercive conduct. *United States v. Pirolli*, 673 F.2d 1200, 1204 (11th Cir. 1982); *see also United States v. Gwinn*, 191 F.3d 874, 877 (8th Cir. 1999) *(*holding the defendant's denial of ownership over a duffel bag came after he was seized and handcuffed by the police. "Given this scenario," the court concluded, "[his] actions can hardly be characterized as a voluntary act."); *United States v. Garzon,* 119 F.3d 1446, 1451 (10th Cir.1997) (finding property not abandoned when left on bus after police issued unlawful order to remove all possessions from bus); *United States v. Lewis*, 921 F.2d 1294, 1302 (D.C. Cir. 1990) ("An

abandonment may be involuntary, and thus invalid, where it results directly from police misconduct, such as an illegal search or seizure, deceit, or, perhaps, a pattern of harassment.").

## D. To the extent Mr. Morgan abandoned the LG phone, he only did so because of unlawful police conduct and other coercive conduct.

Here, through unlawful and other coercive conduct, the agents directly caused Mr. Morgan's purported abandonment of the LG phone and rendered his purported abandonment involuntary.

First, on entering the apartment, agents immediately seized Mr. Morgan and had him handcuffed "on the ground, prone, in custody." (DE121:65). After the agents had Mr. Morgan in custody, they seized the cell phones he had on his person. (DE121:65-67,71). Feo then questioned him about the cell phones, and Mr. Morgan told her they both belonged to him and were taken from him by the agents. (DE115:10,32; DE121:71). At this point, therefore, the undisputed evidence is Mr. Morgan asserted ownership and did not abandon the LG cell phone.

The agents later took Mr. Morgan, still in handcuffs, from the apartment to a HSI car. (DE115:10-11,14). In the HSI car, Mr. Morgan unequivocally invoked his rights to remain silent and to counsel.

(DE115:13,32;Suppression Hrg./GX4). Despite Mr. Morgan's express invocation of his constitutional rights, Gaviria questioned Mr. Morgan about whether the two phones agents seized from him belonged to him. (DE115:14). Mr. Morgan became flustered and said, "Uhm [sic] I don't know, I'm not sure." (DE115:14). Not satisfied with that answer, Gaviria misrepresented "that [she] wasn't trying to interrogate him or ask him questions about the case." (DE115:14). Only in response to this unlawful questioning, Mr. Morgan finally answered, "Only the iPhone." (DE115:14). Indeed, the court ruled Gaviria violated Mr. Morgan's *Miranda* rights by questioning him in this manner. (DE115:62-63;DE63). This sequence of events demonstrates the government did not prove Mr. Morgan's voluntary abandonment of the LG phone, and his purported abandonment only occurred due to police misconduct and coercive action.

In *Gwinn*, the court held denying ownership after the police seized and handcuffed the person "can hardly be characterized as a voluntary act." *Gwinn*, 191 F.3d at 877. Here, we have more substantial facts that demonstrate involuntariness: Mr. Morgan's denial occurred when law enforcement (1) had seized and handcuffed him in a prone position, (2) questioned him without any *Miranda* warnings, (3) moved him to the

back of a police car while handcuffed, (4) where he invoked his right to silence and counsel, (5) notwithstanding his invocation interrogated him to the point he became "flustered," and (6) pressed and deceived him when he did not give the agent a definitive answer. *See id*; *see also Lewis*, 921 F.2d at 1302 (D.C. Cir. 1990). Then, and only then, did Mr. Morgan disavow the LG phone. These facts amply demonstrate that the police's misconduct and other coercive actions directly caused Mr. Morgan's purported abandonment of the LG phone. Consequently, his disavowal was involuntary and did not justify the warrantless search.

### E. The district court erred by holding that Mr. Morgan abandoned the LG cell phone.

Despite calling the issue "close," the court concluded Mr. Morgan's disavowal of the LG phone—despite being the product of a *Miranda* violation and other coercive tactics—constituted voluntary abandonment. (DE115:59-63) Later, in his written order, the district court stated the "uncontradicted testimony established that the LG phone was abandoned property . . .." (DE63). In reaching this conclusion, the district court made multiple errors.

*First*, the testimony was not "uncontradicted." When initially asked about the cell phones, Mr. Morgan said they were both his—this

statement directly contradicts his later un-*Mirandized* statement. (DE 115:10,32).

*Second*, the test is not whether the agents were "reasonable" in believing Mr. Morgan had abandoned the LG phone. Instead, the government had to prove that Mr. Morgan *voluntarily* abandoned the property, and because the evidence conflicted, the government did not meet this burden. *Ramos*, 12 F.3d at 1023. Notwithstanding, the agents were not reasonable given they had seized the phone from Mr. Morgan's person; he initially admitted the phone belonged to him, and his disavowal only resulted from persistent and deceitful questioning after he had invoked his *Miranda* rights to silence and counsel. (DE 115:10, 13-14,32; DE 121:60-67).

*Third*, as asserted above, the court erred by holding Mr. Morgan's abandonment was voluntary and not due to the unlawful and other coercive actions of the police. *See Bailey,* 691 F.2d at 1014 & n. 3 (11th Cir.1982); *Pirolli*, 673 F.2d at 1204 (11th Cir. 1982).

*Fourth*, the court erred by allowing the government to use the compelled statement in the HSI car as evidence of abandonment at the suppression hearing, thereby violating Mr. Morgan's Fifth Amendment

rights to silence and counsel. *See Chavez v. Martinez*, 538 U.S. 760, 767 (2003) (stating a violation of the Fifth Amendment occurs when statements compelled by police interrogations are used in a criminal case); *see also Sornberger v. City of Knoxville, Ill.,* 434 F.3d 1006, 1026 (7th Cir. 2006) (holding use of unwarned statements at preliminary hearing were used against her in a "criminal case" and implicated the Fifth Amendment).

**F.   The government forfeited reliance on the "independent discovery" rule, and the district court overstepped by relying on this additional rationale.**

Belaboring the obvious, courts function in an "adversarial system of adjudication" and "rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *United States v. Sineneng-Smith*, 590 U.S. ---, 140 S. Ct. 1575, 1579 (2020). Our legal system is "designed around the premise that the parties know what is best for them and are responsible for advancing the facts and arguments entitling them to relief." *Greenlaw v. United States*, 554 U.S. 237, 244 (2008) (quotation omitted).

In this case, Mr. Morgan filed a motion to suppress, and the government responded with the arguments they believed were supported

by the law and the facts—that Mr. Morgan abandoned the LG phone. After the suppression hearing, the district court orally ruled in the government's favor and relied exclusively on that rationale. Notwithstanding, the district court supplemented his oral ruling with a written order—*after* the jury convicted Mr. Morgan—that held the search of the LG cellphone was also justified under the "independent discovery" rule. But the government forfeited this issue, and the district court did not have any cause to intervene. This Court should not consider this alternative rationale the government did not raise, and the parties did not litigate.

## G. The "independent discovery" rationale fails on the merits.

Regardless, the district court erred because the independent discovery rationale is factually inapplicable. This doctrine applies "to evidence obtained for the first time during an independent lawful search" and "to evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality." *Murray v. United States*, 487 U.S. 533, 537 (1988). Absent any finding of abandonment, the agents could only have searched the cell phone legally through a search warrant. *See*

*Riley v. California*, 573 U.S. at 386. But the government never sought a warrant and therefore never conducted an "independent lawful search." Consequently, even if considered by this Court, the district court's *post hoc, sua sponte* holding fails.

## H. Because the district court made a constitutional error, the government must prove harmlessness beyond a reasonable doubt.

For Fourth Amendment violations, the government must prove beyond a reasonable doubt the error did not influence the verdict in the case. *See Chapman v. California*, 386 U.S. 18, 22 (1967). An "error is harmless if there is no reasonable probability that the evidence complained of *might have contributed* to the conviction." *United States v. Turner,* 871 F.2d 1574, 1581–82 (11th Cir.1989) (cleaned up and emphasis added).

## I. The government cannot meet the *Chapman* burden.

In sum, the government's "search of the LG cellphone revealed incriminating evidence against [Mr.] Morgan to include email addresses associated with [him], communications with individuals from St. Maarten, and WhatsApp conversations discussing the coordination of multiple shipments from St. Maarten to Florida." (DE55:5 *see also*

DE121:97-113; GX 35). In other words, the prosecution's whole case rested on the LG phone.

Specifically, Gaviria testified the extraction showed several messages between Mr. Morgan and another person—"Bredda"—in St. Maarten that were linked to various shipments. (DE121:98,101-113;GX 35-36,38,42).

In addition, the government introduced DHL waybills and invoices they extracted from the LG phone that connected these documents to messages between Mr. Morgan and Bredda. (DE121:104-112; GX 37-38,42). Gaviria also testified through the extraction, they found messages discussing Western Union transactions and photos of Western Union receipts. (DE121:113, 128-129; GX 40). She further testified, based on the search of the LG phone, Mr. Morgan had "multiple text conversations where he asked people either directly to send money on his behalf or find other people who would be willing to send money on his behalf." (DE121:121-128; GX 47-48).

Gaviria also testified the information she found on the LG phone led her to subpoena DHL for additional waybills and invoices. (DE121:106-112; GX 36-38). Comparing the DHL records to information

found on the LG phone, Gaviria testified Mr. Morgan gave Bredda a phone number, name, and address for a shipment. (DE121:112). Bredda then shipped the package and gave Mr. Morgan the confirmation. (DE121:112).

Based on information from the LG phone, Gaviria also issued a subpoena to FedEx. (DE121:137-142; GX 45-46). The return of this subpoena showed shipments of bump stopper cream from the United States to St. Maarten. (DE121:141). Similarly, Gaviria testified the information she found on the LG phone led her to subpoena Western Union for information regarding payments connected to the shipments. (DE121:112-117,121; GX 39). Gaviria testified that by comparing the Western Union records to text messages she found on the LG phone, she concluded that Mr. Morgan sent money to various people in St. Maarten. (DE121: 121-129; GX 40,47-48).

Using the information found on the LG phone, Gaviria prepared two charts: (1) a chart that compared the money Mr. Morgan sent to St. Maarten versus the value of the bump stopper cream bottles that were shipped to the United States (DE121:130; GX41); and (2) a chart that summarized the information that linked Mr. Morgan to thirteen

shipments. (DE121:130-136; GX43). On this chart, there were nine separate references that identified information sourced from the LG phone. (GX 43).

As discussed below, Gaviria offered lay opinion testimony based on the evidence obtained and derived from the search of the LG cell phone. Similarly, Suarez offered expert testimony based on this evidence.

Finally, the government's closing argument confirmed the importance of this evidence. In closing argument, the prosecutors used the evidence obtained from the search of the LG phone and evidence derived from that search. For example, the prosecutors made numerous references to the evidence found on the LG phone. (DE124:19, 20-21,25-26,46,48). They also argued the FedEx, DHL, and Western Union records found on the LG phone and derived from the search were significant in proving Mr. Morgan's guilt. (DE124:16-19, 21, 24, 28, 47, 49; GX 41). The prosecutors highlighted Suarez's and Gaviria's testimony. (DE124:16, 20, 27).

Accordingly, based on the quantity and quality of the evidence the government obtained, derived, and introduced from the warrantless search of the LG phone, the government cannot make the required

beyond a reasonable doubt showing under *Chapman*—that there is no reasonable probability the evidence *might have contributed* to Mr. Morgan's convictions. *Turner,* 871 F.2d at 1581–1582.

A longstanding and fundamental principle in our legal system is that "[a wrongdoer] should not make a profit out of his own wrong." *Root v. Railway Co.*, 105 U. S. 189, 207 (1882). This principle is found in many different areas of the law and is present here in the Fourth and Fifth Amendment contexts. The Fourth Amendment requires the government to obtain a warrant to search a cell phone. The Fifth Amendment prohibits the use of compelled statements in a criminal case. The government cannot profit from Gaviria's unlawful and other coercive actions to escape these requirements. This Court should reverse the district court's contrary decision and vacate Mr. Morgan's convictions.

## ISSUE II

### THE DISTRICT COURT ERRED BY ALLOWING FEO TO TESTIFY ABOUT HER UN-*MIRANDIZED* CUSTODIAL INTERROGATION OF MR. MORGAN AND DENYING MR. MORGAN'S REQUEST FOR A MISTRIAL.

Although Agent Feo knew her partners had placed Mr. Morgan in custody, she questioned him without providing *Miranda* warnings.

(DE121:68). Without the benefit of any warning, she asked Mr. Morgan whether both phones were his. (DE115:10,32). He responded yes. (DE115:10,32).

At trial, when the prosecutor attempted to elicit Mr. Morgan's un-*Mirandized* statements, the defense objected. (DE121:68). The district court reminded the prosecutor—at sidebar—that he had suppressed these statements. (DE121:69). The prosecutor did not challenge the district court's ruling. (DE121:69).

The matter did not end there. On cross-examination, defense counsel asked Feo whether she knew where "on his person" the agents took the LG phone from Mr. Morgan. (DE121:71). By this question, defense counsel clearly asked Feo whether she knew the location on Mr. Morgan's body from where the agents seized the phone. (DE121:71). Feo answered: "I don't know exactly where it came from on his person, but it came off of him because I confirmed that by speaking with him." (DE121:71). The first part of her answer responded to counsel's question. The second part was non-responsive and gratuitously violated Mr. Morgan's constitutional rights.

After the district court excused Feo, defense counsel raised the *Miranda* issue and requested a mistrial. (DE121:73-74). The district court said in response to counsel's argument: THE COURT: "There's no way what the reason was -- because we're at sidebar, there's no way she can hear what was ruled on so she answered the question by volunteering information that wasn't responsive to the question." (DE121:74). Although the district court agreed that Feo gave an unresponsive answer that violated Mr. Morgan's constitutional rights, he denied the motion for mistrial. (DE121:73-74).

The issue then took another turn. The prosecutor asked the district court "to revisit . . . your ruling on the pretrial motion . . . – [and asserted that] in fact, I remember we specifically asked if we could elicit that particular statement that he claimed ownership and your ruling at that time was that we could but [defense counsel] could in turn elicit the statement that he later learned. (DE121:744). The district court responded:

> It was definitely what I ruled, *but I changed my mind in the middle of the trial* when I heard, you know, the facts of the case and from the witness testifying I think it was an interrogation and I think it was without *Miranda*, and I changed my ruling. But there's no way that the witness would have known that I changed my ruling, and there's no way for

you to have communicated to the witness that I changed my ruling; so she was just offering what she thought, you know, she was supposed to testify to. It was unresponsive, and I'll tell the jury to ignore it, that it's not for their consideration.

(DE121:44) (emphasis added).

Based on this statement, the district court believed he ruled pre-trial that the prosecutor could elicit the un-*Mirandized* statement but changed his mind during the trial and neglected to inform the parties. (DE121:44). But that's not completely accurate. When the prosecutor attempted to elicit Mr. Morgan's answers, the defense objected. (DE121:68). At sidebar, the district court told the prosecutor he had suppressed these statements. (DE121:69). The prosecutor did not challenge this ruling. (DE121:69). Therefore, he did inform the parties—at that point—he had decided to suppress those statements. To try to remedy the issue, the district court gave a curative instruction after Feo had been excused. (DE121:75).

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . .." To safeguard the uncounseled individual's Fifth Amendment privilege against self-incrimination, the *Miranda* Court held, suspects interrogated while in police custody must be told that they have a right

to remain silent, that anything they say may be used against them in court, and that they are entitled to the presence of an attorney, either retained or appointed, at the interrogation. *Miranda*, 384 U.S. at 444. In other words, "the *Miranda* rule is a prophylactic employed to protect against violations of the Self-Incrimination Clause." *United States v. Patane*, 542 U.S. 630, 636 (2004) (plurality opinion); see *also Howes v. Fields*, 565 U.S. 499, 507 (2012) (quoting *Maryland v. Shatzer*, 559 U.S. 98, 103 (2010)). "[I]f the police take a suspect into custody and then ask him questions without informing him of the rights enumerated above, his responses cannot be introduced into evidence to establish his guilt." *Berkemer v. McCarty*, 468 U.S. 420, 429 (1984) (citations omitted). The district court erred by failing to suppress the statement initially and not informing the parties when he changed his mind during trial.

As previously discussed, the government's whole case was based on the LG phone. By allowing the trial to continue after Feo testified to this un-*Mirandized* custodial statement, the district court eviscerated Mr. Morgan's defense—the jury heard that he had admitted to Feo that the LG phone belonged to him. The district court erred and should have declared a mistrial.

## ISSUE III

**THE DISTRICT COURT COMMITTED PLAIN ERROR BECAUSE AGENT GAVIRIA BASED HER LAY OPINION ON THE "ENTIRE INVESTIGATION"— INCLUDING UNLAWFULLY OBTAINED EVIDENCE. THEREFORE, SHE DID NOT RATIONALLY BASE HER OPINION ON HER PERCEPTIONS, AND HER OPINION WAS NOT HELPFUL TO THE JURY.**

Agent Gaviria's damning lay opinion testimony that Mr. Morgan engaged in international drug trafficking violated Federal Rule of Evidence (FRE) 701. Here's what the prosecutor asked and what Gaviria answered:

> Q. And so based on your investigation of this case, can you give us an overview of the international drug trafficking scheme involving the BUMP Stopper cream that you recovered in this case?
>
> A. Yes. So *over the course of the entire investigation*, I obtained information indicating that the defendant had purchased BUMP Stopper cream from a legitimate seller here in the United States, arranged for these products to be shipped to Saint Martin [sic] where a contact known to me as Bredda received the shipments, placed cocaine concealed into a false bottom in these containers and shipped the containers back to addresses provided by the defendant. I also obtained information that the defendant either directly or by asking other people caused money to be sent back to Saint Martin to individuals whose information was provided by Bredda.

(DE121:78) (emphasis added). By testifying to these opinions, Gaviria improperly told the jury that she had concluded—based on the "entire"

investigation—that Mr. Morgan was guilty of the drug crimes in the indictment.

But FRE 701 provides that a witness who is not testifying as an expert may only provide lay opinion testimony that is: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue . . .." FRE 701 was designed to ensure that any opinions offered by a lay witness are based on personal, "first-hand knowledge or observation," Fed. R. Evid. 701 adv. comm. note (proposed rule), and "a process of reasoning familiar in everyday life." Fed. R. Evid. 701 adv. comm. note (2000 amend.).

Gaviria's opinion testimony violated Rule 701 in three ways. First, because Gaviria based her opinion on the "entire investigation," she did not rely solely on her own first-hand observations. Second, because she testified in a conclusory fashion, her opinion was not helpful to the jury. Third, Gaviria's "entire" investigation included inadmissible and unlawfully obtained evidence—including evidence obtained and derived from the LG phone that the court should have suppressed, evidence based on three separate *Miranda* violations, an involuntary statement that she

coerced from Mr. Morgan, and Elizondo's interview with law enforcement.

## A. Gaviria's Lay Opinion Based on the "Entire Investigation" Was Impermissible Because Not Based on Her Rational Perception.

A rational perception is one involving "first-hand knowledge or observation." *United States v. Rea,* 958 F.2d 1206, 1215 (2d Cir.1992). *United States v. Mitchell*, 654 F. App'x 21 (2d Cir. 2016), addressed whether the government had met this requirement when lay opinion testimony by an agent is based on the "entire investigation." In *Mitchell*, the prosecutor asked a law enforcement witness, "[W]ere you able to determine that there was a conspiracy in place with individuals and Javier Navarro?" and the witnesses answered, "yes." *Id.* at 24. The Second Circuit held that the witnesses's testimony failed "at least two of the foundational requirements of Rule 701." *Id.* at 25.

The court reiterated that it is "error to allow law enforcement witnesses to express opinions as to defendants' culpability based on the totality of information gathered in the course of their investigations" because "when an agent relies on the 'entirety' or 'totality' of information gathered in an investigation to offer a 'lay

opinion' as to a person's culpable role in a charged crime, he is not presenting the jury with the unique insights of an eyewitness's personal perceptions." *Id.* (quoting *United States v. Garcia*, 413 F.3d 201, 211–12 (2d Cir. 2005). Therefore, because the witness based his conclusion that the defendant was a conspirator on all the information collected by himself and other investigators, his testimony was not rationally based on his own perception. *Id.*; s*ee also United States v. Dukagjini,* 326 F.3d 45, 54 (2d Cir.2003) ("As the testimony of [a] case agent moves ... to providing an overall conclusion of criminal conduct, the process tends to more closely resemble the grand jury practice, improper at trial, of a single agent simply summarizing an investigation by others that is not part of the record.").

Likewise, by basing her opinion on the "entire investigation," Gaviria's lay opinion testimony is similar to the testimony rejected by *Mitchell. See also United States v. Meises*, 645 F.3d 5, 15 (1st Cir. 2011) ("when a law enforcement witness expresses opinions as to defendants' culpability based on the totality of information gathered in the course of their investigation these conclusory statements often involve

impermissible lay opinion testimony, without any basis in personal knowledge, about the role of the defendant in the conspiracy.").

## B. Gaviria's Conclusory Lay Opinion as to Mr. Morgan's Culpable Role in the Offenses Was Not Helpful to the Jury.

A court may allow lay opinion testimony only if it is "helpful" to the jury's "clear understanding of the witness's testimony or the determination of a fact in issue." *United States v. Garcia*, 413 F.3d 201, 213 (2d Cir. 2005). The "purpose of the foundation requirements" of Rule 701 "is to ensure that such testimony does not . . . usurp the fact-finding function of the jury." *United States v. Diaz*, 951 F.3d 148, 156 (3d Cir. 2020) (cleaned up). Therefore, "the helpfulness requirement in 701(b) requires courts to exclude testimony where the witness is no better suited than the jury to make the judgment at issue." *Id*.

In *Garcia*, the Second Circuit "reject[ed] the government's argument that a case agent's opinion as to a defendant's culpable role provides a jury with a helpful summary overview of the evidence. *Id*. at 215; *see also United States v. Grinage,* 390 F.3d 746, 750 (2d Cir. 2004) (explaining that jurors were not "helped" within the meaning of

Rule 701 by opinion testimony that, in addition to telling them "what was in the evidence," also told them "what inferences to draw from it").

Similarly, in *Diaz*, the trial court allowed an agent to testify that in his lay opinion, the defendant worked as a "subordinate" and "at the direction" of a co-conspirator to "bag and distribute drugs." *Diaz*, 951 F.3d at 156. The court said: "This conclusory statement was obviously unhelpful, and the [trial court] should have excluded it under 701(b)." *Id*. Elaborating as to why this evidence should have been excluded, the court explained:

> the jury was perfectly well suited to determine, based on the evidence before them, whether [the defendant] worked as a part of [the] conspiracy. Indeed, that was the primary question facing them. [The agent]'s comments articulated precisely the conclusion the government asked the jury to infer from the evidence presented at trial, removing the jury's need to personally review the evidence. Rather than offering insight the jury could not itself have gleaned from the evidence, [the agent]'s testimony served to provide the conclusion the government wanted the jury to reach. Such conclusory testimony undermines the goal of Rule 701 to exclude lay opinion testimony that amounts to little more than choosing up sides, or that merely tells the jury what result to reach.

*Id*. at 156-157 (cleaned up). In other words, the trial court "allowed precisely the sort of testimony Rule 701 is designed to exclude." *Id*. at 157. The same is true here: Gaviria's lay opinion testimony "served to

provide the conclusion the government wanted the jury to reach" and the district court erred by not excluding this evidence under Rule 701.

## C. Gaviria's Lay Opinion Was Improperly Based on Inadmissible Evidence.

Courts have held that Rule 701 precludes a government agent from offering a lay opinion based on inadmissible hearsay. *See United States v. Flores–de–Jesus,* 569 F.3d 8, 24 (1st Cir. 2009); *United States v. Garcia,* 413 F.3d 201, 213 (2d Cir.2005); *United States v. Griffin,* 324 F.3d 330, 348 (5th Cir. 2003). The courts that have rejected such testimony have started with the basic proposition that "[h]earsay does not become admissible merely because it is provided by a government agent in the form of an overview of the evidence." *See, e.g., United States v. Garcia–Morales,* 382 F.3d 12, 17 (1st Cir. 2004). The same should hold true for other inadmissible evidence.

## D. The District Court Committed Plain Error.

Because Mr. Morgan's lawyer did not object, this Court reviews this issue for plain error. *United States v. Ahmed*, 73 F.4th 1363, 1373 (11th Cir. 2023). Plain error requires "(1) error, (2) that is plain, and (3) that affects substantial rights." This Court may notice the error only if it

"seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.*

Mr. Morgan meets the plain error test. As described above, the district court erred, and the error was plain because the text of Rule 701 resolves the issue in his favor. Because Gaviria based her lay opinion on the "entire investigation," the district court could not have determined that her testimony was rationally based on her perception, much less be confident that her testimony would be "helpful" to the jury in "clearly understanding the witness's testimony or to determining a fact in issue." FRE 701(b). Moreover, Gaviria based her opinion on information not before the jury, including a coerced statement, illegally obtained evidence, and hearsay, thereby potentially "usurp[ing] the jury's function" by presenting the conclusion that should be drawn from facts of which he, but not the jury, was fully aware. *Hampton*, 718 F.3d at 983 (quoting *Grinage*, 390 F.3d at 750–51).

This error affected Mr. Morgan's substantial rights and seriously affected the fairness, integrity, or public reputation of judicial proceedings. As *Hampton* emphasized, "[j]udicial scrutiny of a law-enforcement witness's purported basis for lay opinion is especially

important because of the risk that the jury will defer to the officer's superior knowledge of the case and past experiences with similar crimes." *Id.* at 981–82 (citing *Grinage*, 390 F.3d at 750–51). Jurors may have believed that Gaviria "had knowledge beyond what was before them ... defer[ing] to the officer's superior knowledge of the case and past experiences with similar crimes," rather than independently reaching their own opinions about the evidence and ultimately about whether the government had proved Mr. Morgan guilty beyond a reasonable doubt. *Id.* at 981–83 (quoting *Grinage*, 390 F.3d at 750). This Court should vacate Mr. Morgan's convictions.

## ISSUE IV

### THE DISTRICT COURT COMMITTED PLAIN ERROR BY NOT EXCLUDING EXPERT TESTIMONY THAT RELIED UPON MR. MORGAN'S INVOLUNTARY STATEMENTS AND VIOLATED RULE 16.

According to Agent Marco Suarez—the government's expert on drug trafficking—he relied on three reports that Gaviria provided him to form his opinion: (1) a report that detailed the November 2020 seizure; (2) a report that detailed the involuntary statement that agents coerced from Mr. Morgan; and (3) an extraction summary of a cellular phone that belonged to Mr. Morgan. (DE121:17). Suarez also reviewed an Excel

spreadsheet prepared by Gaviria "listing approximately 58 or 59 Western Union transactions." (DE121:17,20). Notably, when the prosecutor filed the government's "Notice of Intent to Use Expert Testimony," she neglected to inform Mr. Morgan or the district court that Suarez relied on these three reports and the Excel spreadsheet to form his opinion. *See* (DE53:3-4). In fact, this disclosure, signed by Suarez, stated that the only basis for his opinion was his "training and experience." *Id*. Moreover, the prosecutor never informed Mr. Morgan or the district court that she would elicit expert testimony that (1) the Western Union transactions linked to Mr. Morgan were "highly suspicious" and designed to evade law enforcement and (2) that the bump stopper creams bottles were "consistent with international drug trafficking." (*Compare* DE53 *with* DE121:33-34, 39-40).

### A. The district court erred by allowing Suarez to give his expert opinion based, in part, on unlawfully obtained evidence.

Mr. Morgan objected to the government eliciting from Suarez that Mr. Morgan had been interviewed—an "interview" that the district court had ruled was the product of coercion by the agents and that had produced involuntary statements. (DE121:17). Mr. Morgan also moved

for a mistrial. (DE121:17). The district court denied the motion for mistrial but offered to provide a curative instruction to the jury. (DE121:18). The defense declined the district court's offer, fearing the curative instruction would only exacerbate the problem. (DE121:18).

Federal Rules of Evidence 703 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. *If of a type reasonably relied upon by experts in the particular field* in forming opinions or inferences upon the subject, the facts or data *need not be admissible in evidence.*

Fed. R. Evid. 703 (emphasis added).

"The rationale for this aspect of Rule 703 is that experts in the field can be presumed to know what evidence is sufficiently trustworthy and probative to merit reliance." 29 Charles A. Wright and Victor J. Gold, *Federal Practice and Procedure* § 6273, at 311 (1997). Notwithstanding, Rule 703 requires the trial court judge to act as an independent "gatekeeper" to ensure that there is sufficient, credible evidence that experts rely on the specified types of sources in formulating their opinions. *See Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 595-96 (1993); *see also United States v. Floyd*, 281 F.3d 1346, 1349 (11th Cir. 2002) (hearsay testimony by experts is permitted if it is based upon

the type of evidence reasonably relied upon by experts in the particular field.).

Here, the government made no showing that experts in Suarez's field reasonably rely on involuntary statements made by suspects to form their opinions. In *United States v. Scrima*, 819 F.2d 996 (11th Cir. 1987), this Court held the district court did not err by limiting a defense expert witness's testimony because he relied on hearsay statements to form his opinion, and he made no showing this was the type of evidence reasonably relied upon by experts in the particular field in forming opinions or inferences on the subject. *Id.* at 1002. Likewise, here, the government did not attempt to meet the foundational requirements of Rule 703 by showing that experts like Suarez reasonably rely on un-*Mirandized* and coerced statements to form their opinions.

"As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration." *United States v. Hodge*, 933 F.3d 468, 478 (5th Cir. 2019). In some cases, however, the source upon which an expert's opinion relies is of such little weight that the jury should not be permitted to receive that

opinion." *Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th 1278, 1323 (11th Cir. 2022) (cleaned up). This is such a case.

In several cases, the Supreme Court has mandated "the exclusion of reliable and probative evidence for *all* purposes only when it is derived from involuntary statements." *Michigan v. Harvey*, 494 U.S. 344, 351 (1990); *see also New Jersey v. Portash,* 440 U.S. 450, 459, (1979) (compelled incriminating statements inadmissible for impeachment purposes); *Mincey v. Arizona,* 437 U.S. 385, 398 (1978) (same). As the Second Circuit has stated, "there can be little doubt that the doctrine excluding involuntary confessions and admissions bears a clear relationship to the integrity of the fact-finding process. Although a confession, like any statement against interest, is normally a most reliable form of evidence, it is of doubtful reliability when the defendant was physically or psychologically coerced into making it." *U. S. ex rel. Romano v. Fay*, 360 F.2d 389, 394 (2d Cir. 1966).

By using Suarez as an expert, the government impacted the integrity of the fact-finding process. See *Watkins v. Sowders*, 449 U.S. 341, 347 (1981) (recognizing that "an involuntary confession is inadmissible in part because such a confession is likely to be unreliable,

it is also inadmissible even if it is true, because of the strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will."); *Jarrell v. Balkcom*, 735 F.2d 1242, 1252 (11th Cir. 1984) (acknowledging that an involuntary confession is inherently unreliable). Moreover, Mr. Morgan could not confront Suarez without "opening the door" to the unlawfully obtained statements. By allowing the government to introduce this expert testimony, the district court committed an abuse of discretion.

### B. The government violated Rule 16.

In addition, the government violated Federal Rule of Criminal Procedure 16 in eliciting Suarez's expert testimony. Under Rule 16, the government must, in the expert witness context, disclose to the defense "a complete statement of all opinions that the government will elicit from the witness" and "the bases and reasons for them." Fed R. Crim. P. 16(G)(iii). First, the prosecutor did not list any "bases or reasons" for Suarez's expert testimony beyond his "training and experience." (DE53). When he testified, however, Suarez told the jury that he had reviewed the reports and Excel spreadsheet. (DE121:17,20). Second, in her notice,

the prosecutor never disclosed that she would elicit testimony that the Western Union transactions linked to Mr. Morgan were "highly suspicious" and designed to evade law enforcement and that the bump stopper cream bottles were "consistent with international drug trafficking." (*Compare* DE53 *with* DE121:33-34, 39-40).

The introduction of this evidence constituted plain error based upon the text of Rule 16. Moreover, Suarez's testimony affected Mr. Morgan's substantial rights. Reading the government's notice, Mr. Morgan could not have anticipated the breadth of Suarez's testimony and could not effectively combat these surprises at trial. Similarly, failing to give Mr. Morgan proper Rule 16 notice seriously impugns the fairness, integrity, and public reputation of judicial proceedings. As a result, his convictions should be vacated.

# ISSUE V

## THE CUMULATIVE ERRORS COMMITTED BY THE DISTRICT COURT—FAILING TO SUPPRESS THE SEARCH OF THE LG PHONE, ALLOWING THE INTRODUCTION OF AN UN-*MIRANDIZED* STATEMENT, AND IMPROPER LAY AND EXPERT OPINION TESTIMONY, AND NOT CORRECTING A RULE 16 VIOLATION—REQUIRE A NEW TRIAL.

"The cumulative error doctrine provides that an aggregation of non-reversible errors (*i.e.*, plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." *United States v. Baker*, 432 F.3d 1189, 1223 (11th Cir. 2005) (quotation marks omitted). To determine whether the cumulative effect of non-reversible errors prejudiced a defendant, this Court considers (1) the nature and number of the errors committed; (2) their interrelationship, if any, and combined effect; (3) how the district court dealt with the errors as they arose (including the efficacy—or lack of efficacy—of any remedial efforts); (4) the strength of the government's case, and (5) the length of trial. *Baker*, 432 F.3d at 1223.

Mr. Morgan did not receive a fair trial. The nature and the number of errors committed by the district court are significant for the reasons

stated above. This Court should vacate Mr. Morgan's convictions and remand for a new trial.

## CONCLUSION

For the reasons stated herein, this Court should vacate Mr. Morgan's convictions.

Respectfully submitted,
*/s/ Michael Caruso*
MICHAEL CARUSO
Federal Public Defender
Attorney for Appellant
150 West Flagler Street, Suite 1500
Miami, Florida 33130
(305) 536-6900

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), because it contains 12,997 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f). I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Century Schoolbook 14-point font.

*/s/ Michael Caruso*
MICHAEL CARUSO

**CERTIFICATE OF SERVICE**

I HEREBY certify that on this 16th day of October 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and sent four copies to the Clerk of the Court via third-party commercial carrier for delivery within three days. I also certify that the foregoing document is being served this day via CM/ECF on Daniel Matzkin, Assistant United States Attorney, 99 N.E. 4th Street, Miami, Florida 33132.

*/s/ Michael Caruso*
MICHAEL CARUSO